IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EXTENDICARE HEALTH SERVICES, INC.,** | : | **Civil No. 1:05-2676** |
| | : | |
| | : | **JUDGE SYLVIA H. RAMBO** |
| **Plaintiff and Counterclaim Defendant** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DISTRICT 1199P, SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO, CLC,** | : | |
| | : | |
| | : | |
| **Defendant and Counterclaim Plaintiff** | : | |

**M E M O R A N D U M**

This action is to determine the enforceability of an arbitration award reinstating an employee to her position in a personal care home. The personal care home argues that her reinstatement is contrary to public policy, and requests that this court enter summary judgment vacating or modifying the award. The union representing the employee maintains that her reinstatement is not contrary to public policy and therefore must be enforced by this court. Guided by the Supreme Court's decision in *Eastern Associated Coal Corp. v. United Mine Workers, Dist. 17*, 531 U.S. 57 (2000), this court agrees with the union and will enter summary judgment in its favor.

I.          **Background**

A.      **Facts**

Tracey Poth was hired by Glenshire Woods Personal Care Home ("Glenshire Woods"), operated by Plaintiff Extendicare Health Services, Inc., on or about May 16, 1998.  (Arbitrator's Award ["Award"] 11.)  She was employed as a Medication Aide at Glenshire Woods from that date until she was fired on July 2, 2004.  (*Id.*)

Ms. Poth was fired because the management of Glenshire Woods discovered that her criminal history included four misdemeanor convictions, dated October 18, 1990, for receiving stolen property.  (*Id.* at 25.)  The facility administrator determined that the misdemeanor convictions constituted "barrier offenses" under the Older Adult Protective Services Act, 35 Pa. Cons. Stat. Ann §§ 10225.101-10225.5102 ("OAPSA").  The administrator read the statute to mean that a personal care home, such as Glenshire Woods, is prohibited from continuing to employ an individual convicted of such barrier offenses.  (Award 25.)  Additionally, Ms. Poth's record showed a number of additional convictions for DUI-related offenses (Joint Appendix ["J.A."] Ex. J), none of which are barrier offenses under OAPSA.  As a result, on July 2, 2004, Ms. Poth was fired.  (Award 27.)

Ms. Poth filed a grievance with her union, Defendant District 1199P, Service Employees International Union AFL-CIO, CLC ("Union").  The Union and Glenshire Woods are bound by a collective bargaining agreement ("CBA") that governs the terms and conditions of facility employment practices.  (CBA Art. 1.) The CBA states  that "no employee shall be dismissed . . . without just cause."  (*Id.* Art. 14.1.)  The term "just cause" is not defined in the agreement.

The Union and Glenshire Woods disagreed over whether Ms. Poth's termination was based on "just cause." They resorted to arbitration, as required by the CBA. (*Id.* Art. 16.2.) The arbitrator was charged to decide whether Glenshire Woods had "just cause" to terminate Ms. Poth because her criminal history made her dismissal mandatory under OAPSA. (Award 29.) Other facts before the arbitrator were Ms. Poth's DUI-related convictions during her employment at Glenshire Woods. (Award 13.) The Joint Appendix filed with this court also shows a number of reports of her disciplinary infractions while employed (J.A. Ex. N) and a collection of employee awards and commendations that she earned at Glenshire Woods (J.A. Ex. T).

The arbitrator found that Ms. Poth's termination was neither mandatory nor the result of "just cause." (*Id.* at 30.) He determined that, in *Nixon v. Commonwealth*, 839 A.2d 277 (Pa. 2003), the Pennsylvania Supreme Court had declared unconstitutional the criminal records chapter of OAPSA, as it applied to "employees similarly situated to [Ms. Poth]." (Award 29-30.) He found that the Pennsylvania Department of Aging ("PDA") promulgated "new rules" after *Nixon* that do not prohibit someone with Ms. Poth's criminal history from being employed by a personal care home. (*Id.* at 30.) Because Glenshire Woods was not required by law to discharge Ms. Poth and her termination was not supported by just cause (*id.*), the arbitrator ordered her reinstated to her position as Medication Aide retroactively to July 2, 2004, with all lost salary, benefits, and seniority owed her from that date (*id.* at 34-35).

**B.**     **Procedural History**

The arbitral award was entered on December 1, 2005.  On December 28, 2005, Glenshire Woods filed the instant suit, requesting that this court modify or vacate the award.  (Doc. 1.)  The parties agreed that the matter be determined upon motions for summary judgment.  (Doc. 7.)  The Union filed its motion for summary judgment (Doc. 16) and supporting brief (Doc. 17) on May 11, 2006.  Glenshire Woods filed its motion for summary judgment (Doc. 20) and supporting brief (Doc. 21) on the same date.  After both sides filed briefs in opposition (Docs. 24, 25) and reply briefs (Docs. 26, 27), the matter is ripe for disposition.

**II.**     **Legal Standard**

**A.**     **Summary Judgment**

The familiar standard of Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The standard remains the same when parties file cross-motions for summary judgment.  *Pa. Fed'n of Sportsmans Clubs v. Norton*, 413 F. Supp. 2d 358, 365 (M.D. Pa. 2004).  The court must construe each motion separately, however, viewing the evidence presented in the light most favorable to the non-moving party.  *Id.*  When the parties agree on the facts presented to the court, the court may accept them as true and not in dispute for purposes of summary judgment.  *Baer v. Chase*, 392 F.2d 609, 615 (3d Cir. 2004).

Here, the parties do not dispute the facts of this case.  They submitted to the court a joint appendix of exhibits that comprise the entire factual record.  The

parties recognize that their arguments are solely arguments of law and have agreed to dispose of the case on summary judgment. (Doc. 7.)  Thus, summary judgment by the court is proper.

###    B.    Judicial Review of an Arbitral Award

####        1. Generally

Judicial review of a labor arbitrator's decision, when entered pursuant to a collective bargaining agreement, is exceedingly narrow.  *Nat'l Ass'n of Letter Carriers v. U.S. Postal Serv.*, 272 F.3d 182, 185 (3d Cir. 2001).  If the arbitrator is unbiased, honest, and acts within the scope of the authority granted him, a reviewing court may set aside an arbitral award only in rare cases.  *E. Associated Coal Corp.*, 531 U.S. at 62.  The award must be closely derived from the collective bargaining agreement itself, not from the arbitrator's "own notions of industrial justice."  *Id.* at 62 (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).  If these requirements are met, the reviewing court may not vacate an award even if the court "is convinced [the arbitrator] committed serious error."  *Misco, Inc.*, 484 U.S. at 38-39 (allegations of "improvident, even silly, factfinding" insufficient to overturn award); *Nat'l Ass'n of Letter Carriers,* 272 F.3d at 185 (the test of a valid arbitration award is "singularly undemanding") (quotation omitted).

Limited judicial review of arbitration awards is proper because such awards are part of the "continuous collective bargaining process" between a union and an employer.  *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 596 (1960).  When a union and an employer contract to be bound by an arbitrator's decision in the event of a dispute about the interpretation of the agreement, the arbitrator's findings of fact and conclusions of law must be treated as if they

represent "an agreement between [the employer] and the union as to the proper meaning of the contract's words." *E. Associated Coal Corp.,* 531 U.S. at 62; *accord Misco Inc.,* 484 U.S. at 37-38; *Enter. Wheel & Car Corp.*, 363 U.S. at 599.  A party "should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for." *Misco, Inc.*, 484 U.S. at 37.

As with all contracts, however, a reviewing court may not enforce an award that renders the collective bargaining agreement unenforceable as contrary to public policy. *E. Associated Coal Corp.,* 531 U.S. at 62; *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum, & Plastic Workers,* 461 U.S. 757, 766 (1983).  The reviewing court must determine whether the award itself "run[s] contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests." *E. Associated Coal Corp.,* 531 U.S. at 63; *accord W.R. Grace & Co.,* 461 U.S. at 766.

"Positive law" includes existing statutes, legal precedent, *Misco, Inc.*, 484 U.S. at 44, and agency regulations, *E. Associated Coal Corp.,* 531 U.S. at 63.  It does not encompass mere common sense, assumption, or speculation.[1]  *Misco, Inc.*, 484 U.S. 29, 44 (1987).  The statutes, precedent, and regulations considered must state with specificity the public policy to be enforced.  *See W.R. Grace & Co.,* 461

---

[1] "[C]ourts' authority to invoke the public policy exception is not limited solely to instances where the arbitration award itself violates positive law.  Nevertheless, the public policy exception is narrow and must satisfy the principles set forth in *W.R. Grace* and *Misco*." *E. Associated Coal Corp.,* 531 U.S. at 63.  The First Circuit acknowledged that "[e]ven in the absence of a specific law or regulation barring reinstatement . . . there might be conduct so egregious that reinstatement might threaten the general public policy promoting [worker] competence." *Boston Med. Ctr. v. Serv. Employees Int'l Union, Local 285*, 260 F.3d 16, 25 (1st Cir. 2001).  Many cases observe that a court may to go beyond "positive law" to find public policy, but they rarely do so.

U.S. at 766.  The court, not the arbitrator, is the final authority on the question of public policy.  *Id.*  Accordingly, the court may examine the arbitrator's findings of fact and conclusions of law if either are implicated in the public policy analysis.  *See id.*;  *E. Associated Coal Corp.,* 531 U.S. at 62.

## 2. Awards for Reinstatement

When examining an award of reinstatement, the court "must assume that the collective-bargaining agreement itself calls for [the employee's] reinstatement."  *Id.* at 61.  Thus, the party seeking to vacate the award must show that the reinstatement itself would contravene public policy, as ascertained by reference to a specific provision of positive law.  *Id.* 62-63, 66; *Mercy Hosp., Inc. v. Mass. Nurses Ass'n*, 429 F.3d 338, 343 (1st Cir. 2005); *see Stead Motors v. Automotive Machinists Lodge No. 1173*, 886 F.2d 1200, 1216-17 (9th Cir. 1989).  If reinstatement is not prohibited by statute, precedent, or regulations, the award must be enforced.  *E. Associated Coal Corp.,* 531 U.S. at 66.

A broadly-worded statute stating general goals for a profession is not sufficient to bar an employee's reinstatement when awarded by an arbitrator.  *Boston Med. Ctr.*, 260 F.3d at 23; *see id.* at 25 (statutes and case law in favor of competent nursing care did not establish a public policy prohibiting the reinstatement of a nurse who committed one act of negligence in her ten-year employment history); *Pan Am. Airways Corp. v. Air Line Pilots Ass'n*, 206 F. Supp. 2d 12, 23 (D.D.C. 2002) (statute requiring "safe and adequate interstate air transportation" was too general to prohibit the reinstatement of a pilot).  Though "reasonable people can differ" on the wisdom of an award reinstating a particular employee, as long as it is not prohibited by law, the award must stand.  *E. Associated Coal Corp.,* 531 U.S. at 67; *accord*

*Stead Motors*, 886 F.2d at 1216-17 (enforcing reinstatement of a mechanic who was regularly negligent in making repairs because California law did not make his continued employment illegal).

 *Eastern Associated Coal Corp.* is a helpful illustration of the public policy assessment required when confronted with a reinstatement award.  In that case, Department of Transportation regulations mandated drug testing for drivers of commercial vehicles.  *E. Associated Coal Corp.,* 531 U.S. at 63-64.  The regulations required sanctions for drivers who tested positive for illegal drug use one or more times, but also allowed such drivers to complete rehabilitation programs and achieve reinstatement.  *Id.* at 64.  A driver twice tested positive for marijuana consumption.  *Id.* at 59.  After his employer sought to discharge him, an arbitrator reinstated him to his position with a number of rehabilitative conditions.  *Id.* at 60-61.

 The Supreme Court affirmed the district court's decision to enforce the arbitral award that required his reinstatement.  *Id.* at 67.  Although the applicable law and regulations counseled strongly against drug use by those operating commercial vehicles, they did not explicitly require that a driver who tests positive for drug use be discharged.  *Id.* at 65.  Further, the award was consistent with the agency's rehabilitation paradigm that allowed former drug users to return to productive work.  *Id.* at 66.

### 3.  <u>The Instant Inquiry</u>

 Turning to the case at hand, the parties do not allege that the arbitrator was biased, dishonest, or went beyond the scope of his authority.  Nothing in the record suggests that conclusion.  Glenshire Woods nonetheless argues that this court should vacate the award because reinstating Ms. Poth is contrary to public policy.

Thus, this court must examine applicable "positive law" to determine whether Ms. Poth's reinstatement runs "contrary to an explicit, well-defined, and dominant public policy," such that it is illegal for her to be employed by Glenshire Woods. *See id.* at 63.

## III.        Discussion

The parties have identified two sources of "positive law" applicable to Ms. Poth's reinstatement, OAPSA and the laws governing the licensing of personal care homes under the Public Welfare Code ("PWC"), 62 Pa. Cons. Stat. Ann. §§ 1001-1087.  Neither prohibit Ms. Poth's reinstatement.

### A.  The Older Adult Protective Services Act

OAPSA, as interpreted by the Pennsylvania Supreme Court, does not prohibit Ms. Poth's continued employment at Glenshire Woods.

#### 1.  Legal Standard

"Positive law" for the criminal history reporting chapter of OAPSA includes the text of the statute itself and the Pennsylvania Supreme Court decision of *Nixon v. Commonwealth*, 839 A.2d 277 (Pa. 2003).  The parties contest the applicability of a document issued after *Nixon* by the Pennsylvania Department of Aging ("PDA").  The court concludes that the document does not constitute positive law applicable to the public policy analysis.

### a.  The Statute

For the protection of persons aged 60 years or older, the Pennsylvania General Assembly enacted OAPSA in 1987.  35 Pa. Cons. Stat. Ann. § 10225.102. The Act sets forth a system of reporting, record-keeping, hiring, and employee retention for facilities that provide eldercare, directed toward ensuring the safety of older adults.  *Id.*  PDA was granted the power to create a regulatory scheme "in consultation with" the Department of Health and the Department of Public Welfare. *Id.* § 10225.504.

OAPSA sets forth numerous requirements for employment practices in personal care homes.  At issue here is the chapter governing the treatment of employees or applicants with a criminal history.  *Id.* §§ 10225.501-508.  An applicant or current employee, who has or may have direct contact with a resident of the home, must submit a criminal history report to her prospective or current employer.  *Id.* § 10225.502.  If an individual's criminal history contains convictions for, *inter alia*, two or more misdemeanors for theft or theft-related offenses, a personal care home may not hire or retain her.  *Id.* § 10225.503(a)(2).  Civil and criminal sanctions will be levied if a facility hires or continues to employ someone with such a "barrier offense."  *Id.* § 10225.505.  An individual employed by a personal care home for one year before the effective date of the statute is exempt from the criminal history reporting requirement, however.  *Id.* § 10225.508(1).  A facility may keep that person on staff even if she has been convicted of a barrier offense.  *Id.*

### b. *Nixon v. Commonwealth*

Five years after OAPSA became effective, the Pennsylvania Supreme Court held that the criminal history reporting chapter of OAPSA violated the Pennsylvania constitution as it applied to the plaintiffs in that case. *Nixon*, 839 A.2d at 290.[2]  The plaintiffs in *Nixon* had convictions for barrier offenses that were twelve to nineteen years old. *Id.* at 394 n.9.  They had demonstrated rehabilitation by working in the health care industry for times ranging from "several" to twenty-six years, without incurring another barrier offense. *Id.*  The former supervisor of each respective plaintiff submitted a declaration that he or she was satisfied with the job

---

[2]Two Commonwealth Courts and some secondary sources read *Nixon* to hold OAPSA's criminal history chapter unconstitutional on its face. *Warren County Human Servs. v. State Civil Serv. Comm'n*, 844 A.2d 70, 72 n.5, 73 (Pa. Commw. Ct. 2004); *see id.* at 76 (Cohn, J. dissenting); *D.C. v. School Dist. of Phila.*, 879 A.2d 408, 416-17 (Pa. Commw. Ct. 2005); *e.g., Digests of Recent Opinions*, Pa. L. Wkly., Jan. 19, 2004.  The language of the *Nixon* majority opinion itself and a concurring opinion, however, support the conclusion that the chapter is unconstitutional as applied.  First, the court's narrow holding "affirm[s] the Commonwealth Court's order declaring the criminal records chapter unconstitutional as applied to the [plaintiffs]." *Nixon*, 839 A.2d at 290; *accord Nixon v. Commonwealth*, 789 A.2d 376, 382 (Pa. Commw. Ct. 2001) (holding the criminal history chapter of OAPSA "unconstitutional as applied to [plaintiffs]").  The majority makes a slightly broader statement by "hold[ing] that the criminal records chapter, particularly with regard to its application to the [plaintiffs], does not bear a real and substantial relationship to the Commonwealth's interest in protecting the elderly . . . from victimization, and therefore unconstitutionally infringes on the [plaintiffs'] right to pursue an occupation." *Nixon,* 839 A.2d at 290.  A fair reading of this quote suggests that the criminal history chapter of OAPSA is unconstitutional on its face, but the limiting language of the sentence, repeatedly applying the holding to the plaintiffs themselves, supports the narrower reading that the chapter is unconstitutional as applied.  Further, Justice Castille's concurring opinion articulated his agreement with the majority, stating that "the statute is unconstitutional as applied to the [plaintiffs]." *Nixon*, 839 A.2d at 291 (Castille, J., concurring).

Some secondary sources also recognize that the plain language of the decision invalidates OAPSA's criminal history chapter as applied to the plaintiffs in that case. *See, e.g., Nixon v. Commonwealth: Providing Protection to the Elderly and Disabled by Conducting Criminal Background Checks on Their Caretakers*, 14 Widener L.J. 679, 688 (2005).  Further support is found in the arbitrator's conclusion that *Nixon* held OAPSA unconstitutional as applied (Award 29), as did a decision letter issued by PDA, Department of Aging, *Older Adults Protective Services Act - Criminal Background Check Provisions* (J.A. Ex. Q).

performance of each plaintiff and would rehire that person if permitted by OAPSA. *Id.* at 395 n.10.

The *Nixon* plaintiffs sued under Article 1, section 1, of the Pennsylvania constitution, which guarantees the right to pursue a lawful occupation. *Id.* at 401.  The criminal records chapter did not pass constitutional muster because there was no rational basis for the distinction between "caretakers with convictions who had . . . [held] a single job since . . . a year before the effective date of [OAPSA], from those who may have successfully worked in the industry for more than a year but had not held one continuous job in a covered facility since July 1, 1997."  *Id.* at 289.  The court noted that if rehabilitation was possible for convicted criminals who had been working continuously in one facility since a year before OAPSA became effective, it was possible for other convicted criminals who had not been so employed.  *Id.*

### c.  The Statement of Policy Issued by PDA

In response to the decision in *Nixon*, PDA issued guidelines for facilities covered by OAPSA, regarding criminal history reporting, hiring, and retention policies.  Department of Aging, *Older Adults Protective Services Act - Criminal Background Check Provisions* (Feb. 2004), *available at* http://www.aging.state.pa.us/aging/CWP/view.asp?a=284&Q=228847; follow "NOTICE - Nixon Decision Appealed - How does this impact employment decisions?" (J.A. Ex. Q).  The court finds that the guidelines are not properly considered in the narrow public policy analysis conducted here because they do not have the force of law and they are too ambiguous to articulate an "explicit, well-defined, and dominant" public policy regarding Ms. Poth's reinstatement.

### i.  **The Document Does Not Have the Force of Law**

The document issued by PDA does not have the force of law because it is a statement of policy, not a regulation.  Regulations are "promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency, or prescribing the practice or procedure before such agency." 45 Pa. Cons. Stat. Ann. § 1102(12).  Properly enacted regulations have the force of law and are binding on the courts.  *Borough of Pottstown v. Pa. Mun. Ret. Bd.*, 712 A.2d 741, 743 (Pa. 1998).

To properly enact a regulation, an agency must provide for a public notice and comment period.  45 Pa. Cons. Stat. Ann. § 1201.  Before adopting any proposed regulation, the agency must consider the comments submitted and hold hearings, if appropriate.  *Id.* § 1202.  An agency may omit or modify the notice and comment requirements if "[t]he agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in the order adopting the administrative regulation or change therein) that the procedures specified in [§§ 1201-02] are in the circumstances impracticable, unnecessary, or contrary to the public interest." *Id.* § 1204(3); *see Jeffers v. Commonwealth*, 601 A.2d 401, 143-45 (Pa. Commw. Ct. 1991) (affirming the validity of a regulation promulgated by a Pennsylvania agency under "emergency circumstances" when the public had thirty days to comment on the regulation, the agency provided a statement of the reason for not following the standard procedures for adopting a regulation in §§ 1201-02, and the regulation was published in the Pennsylvania Code); *c.f. Automobile Serv. Council v. Larson*, 474 A.2d 404, 406 (Pa. Commw. Ct. 1984) (regulations held invalid when they were not properly promulgated under the standard or emergency

procedures).  Commonwealth regulations are published in the Pennsylvania Code.
45 Pa. Cons. Stat. Ann. § 702(2).

A statement of policy is a document "promulgated by an agency which
sets forth substantive or procedural personal or property rights, privileges,
immunities, duties, liabilities or obligations of the public or any part thereof, and
includes . . . any document interpreting or implementing any [statute] . . . enforced
or administered by such agency." *Id.* § 1102(13).  It is a forward-looking document
that declares the agency's future intentions to act.  *Borough of Pottstown*, 712 A.2d
at 743 n.8.  A statement of policy does not have the force of law.  *Id.*  Statements of
policy are published in the Pennsylvania Code if they are "general and permanent in
nature."  45 Pa. Cons. Stat. Ann. § 702(3).

The document issued by PDA is a statement of policy, not a regulation.
There is no evidence that PDA followed the procedure for notice and comment
before issuing the statement.  It became effective just thirty-six days after *Nixon* was
handed down.  That is simply not enough time to publish notice of proposed rule-
making, await public comment, thoughtfully consider the comments, and write a
regulation.  Arguably, PDA was acting under emergency circumstances because
*Nixon* had partially invalidated an important aspect of the law governing hiring
practices for sensitive positions in personal care homes.  Even so, the agency did not
allow a public comment period, like the agency did in *Jeffers*.  It did not state its
reason for not following the standard procedures for enacting a regulation, as
required by 45 Pa. Cons. Stat. Ann. § 1204(3).  The text of the document is not in
the Pennsylvania Code.

14

Moreover, the introductory text of the document itself states that PDA "anticipates legislative action in the near future. In the interim, the protective services program in PDA will operate as follows for all facilities required to comply with OAPSA." (J.A. Ex. Q.) This language is forward-looking, declaring the planned course of conduct by PDA until binding law goes into effect. Further, the PDA website refers to the document as a "notice" to facilities covered by OAPSA, not as a regulation. Department of Aging, *Older Adults Protective Services Act - Criminal Background Check Provisions* (Feb. 2004), http://www.aging.state.pa.us/aging/CWP/view.asp?a=284&Q=228847. Accordingly, this court will treat the document as a statement of policy.

This statement of policy is not a proper source of "positive law." It does not have the force of law, unlike the statutes, legal precedent, and agency regulations at issue in *Misco, Inc.* and *Eastern Associated Coal Corp.* It has not been tested by the public notice, comment, and hearing process, nor was it properly promulgated under the emergency regulation statute. It has not been published in the Pennsylvania Code and the issuing agency itself does not ascribe force of law to the document. In light of the extremely narrow scope of permissible review of an arbitrator's decision, the court concludes that the dictates of a non-binding document from a state agency are not properly considered in the public policy analysis.

## ii.  **The Policy Statement is Ambiguous**

The policy statement is not a proper source of public policy for the additional reason that it is ambiguous. Its ambiguity prevents the document from stating an "explicit, well-defined, and dominant public policy" proper for consideration in the very limited scope of the court's review of the arbitration award.

The crux of the statement identifies changes, made in response to the holding in *Nixon*, to hiring and retention rules.  Applicants must still submit criminal history reports to covered facilities when seeking employment.  (J.A. Ex. Q ¶ 1.)  As of February 4, 2004, however, "facilities will not be sanctioned for hiring or continuing to employ individuals who demonstrate rehabilitation by evidence of a minimum five-year aggregate work history in care-dependent services [including eldercare], *without incident*, from either the date of conviction or release from incarceration, whichever is later."  (*Id.* ¶ 5 (emphasis added).)  The requirement that an applicant show evidence of a five-year work history in dependent care appears to be precise enough, but she must also prove that her work history was "without incident" from the date of her conviction or release.  "Incident," for purposes of this policy statement, is ambiguous.  There are a number of reasonable interpretations of the word, but none that this court can identify as the one intended by PDA.

The court rejects the three definitions proffered by the parties because they are unconvincing.  The Union argues that "incident" means "barrier offense." (Union's Br. in Supp. of its Mot. for Summ. J. to Enforce Arb. Award (Doc. 17) 14.)  The arbitrator agreed.  (Award 30.)  Because the interpretation of "incident" has bearing on the public policy analysis, this court may reexamine the arbitrator's conclusion.  The court finds that "incident" is not intended to mean "barrier offense" because the plain language of the policy statement indicates that the two are not synonymous.  PDA used the generic word "incident" at the beginning of paragraph five.  (J.A. Ex. Q ¶ 5.)  Later in the same section, however, PDA used the phrase "previously disqualifying criminal offense" as shorthand for the list of barrier offenses in OAPSA.  (*Id.*)  PDA specifically invoked the barrier offense section of

OAPSA in one sentence, demonstrating its fluency with the statutory construct. Thus, the court will not assume that the agency would use a general, indefinite term like "incident" to refer to the contents of the same statutorily-precise section.

Glenshire Woods argues that "incident" should be read more broadly, to include recurring criminal conduct of any kind (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 24) 10), or an event that presented a risk to residents (Br. in Supp. of Pl.'s Mot. for Summ. J. (Doc. 21) 19). "Incident" does not mean recurring criminal conduct. The policy statement notes that a facility may refuse to employ an individual based on her "criminal history [of] felonies and misdemeanors" that do not rise to the level of barrier offenses. (J.A. Ex. Q ¶ 6.) The specific language demonstrates that PDA used "felonies and misdemeanors" when it intended to signify criminal conduct. The court will not construe the general word "incident" to mean additional criminal conviction or convictions.

Glenshire Woods also argues, in the alternative, that "incident" means an event that presented a risk to residents. This definition is overbroad. It could mean anything from creating a slipping hazard by accidentally spilling a drink on the floor of a facility to negligently giving a lethal dose of medication. Either of these events cause risk to the residents of a facility, but punishing both with termination is absurd. Under the Pennsylvania rules of statutory construction, the court may presume that the language of the policy statement is not intended to produce an absurd result. *See* 1 Pa. Cons. Stat. Ann. § 1922(1) (controlling statutory construction). Further, the statement was promulgated after the Pennsylvania Supreme Court emphasized the importance of rehabilitating former criminals by allowing them to get and maintain jobs in a sector of the market that is in dire need

of workers.  Requiring a facility to deny employment, new or continued, to a person with a criminal background and a minor disciplinary or criminal infraction would not be in keeping with *Nixon*'s rehabilitative objective.

The General Assembly has not legislated further on the proper procedures for addressing the criminal history of an applicant or employee.  The statement of policy at issue here is the last word from PDA on the subject.  Because the statement of policy is not "positive law" appropriate to consider in the narrow world of public policy review, the court will base its decision on the "positive law" of OAPSA and *Nixon*.

## 2. **Analysis**

OAPSA, as modified by *Nixon*, does not prohibit Ms. Poth's reinstatement.  The language of the criminal records provision, as enacted, would have rendered her continued employment illegal.  She was an employee who had direct contact with residents of the personal care home.  She had been convicted of barrier offenses, two or more misdemeanors relating to theft.  She did not qualify for the exception from the reporting requirement contained in the statute because she had not been employed by Glenshire Woods for one year before the effective date of the statute.

*Nixon* changed the calculus, however.  It held the criminal history reporting chapter of OAPSA unconstitutional as applied to plaintiffs in that case.  Because Ms. Poth is similarly situated to those plaintiffs, as noted by the arbitrator (Award 29-30)  and as shown by the reasons that follow for the purposes of conducting the narrow public policy analysis, the court finds that OAPSA is unconstitutional as applied to her.

18

Ms. Poth is similarly situated to the *Nixon* plaintiffs because of the timing of her convictions for barrier offenses and her employment tenure. Her convictions for barrier offenses were entered sixteen years ago. They are more distant in time than the convictions of three of the *Nixon* plaintiffs, but closer than that of two. Before her termination, Ms. Poth had been working in eldercare at Glenshire Woods for about six years without incurring another barrier offense. She was working in that sensitive role as long or longer than two of the *Nixon* plaintiffs, but a shorter amount of time than three.

Ms. Poth's situation differs from the *Nixon* plaintiffs because her employment history and criminal history during her tenure at Glenshire Woods is mixed. Her employment file contains eleven disciplinary infractions ranging from tardiness to "minor" medication errors. (J.A. Ex. N.) Yet Ms. Poth has also received eight commendations or awards from Glenshire Woods for exemplary service to residents and good teamwork skills. (J.A. Ex. T.) Her criminal history from 1998 to 2004 shows three entries for misdemeanor DUI charges, with one conviction thereof, plus a conviction for driving while her license was suspended or revoked. (J.A. Ex. J.) None of these are barrier offenses or offenses which would have led directly to her termination. Although the question is close, the court finds that Ms. Poth is more like the *Nixon* plaintiffs than not. Thus, it is unconstitutional to enforce the mandatory termination provision of OAPSA's criminal history chapter against her. Because the termination provision is invalid against her, there is no specific provision of OAPSA that prohibits her continued employment at Glenshire Woods. The arbitrator's award, on this analysis of public policy, will stand.

**B.   Licensing Enforcement by the Department of Public Welfare**

The court now turns to the second iteration of positive law presented, the licensing authority of the Department of Public Welfare ("DPW").  It does not prohibit Ms. Poth's reinstatement.

**1.  Legal Standard**

The Department of Public Welfare is the agency directed by the PWC to license personal care homes.  62 Pa. Cons. Stat. Ann. § 1007.[3]  The General Assembly also authorized DPW to adopt regulations establishing minimum standards to qualify for such licenses.  *Id.* § 1021.  DPW will issue a license to a personal care home when the department is satisfied that the facility "meet[s] all the requirements of [the PWC] and of . . . applicable statutes, ordinances and regulations."  *Id.* § 1007; *see* 55 Pa. Code § 2600.3.  If DPW finds that a facility is not in compliance with any aspect of the Public Welfare Code or the department's regulations issued thereunder, the agency must revoke the facility's license.  PWC § 1026(b).  If a facility continues to operate without a license, DPW may seek a

---

[3]This statute will be cited as "PWC § __."

In 1967, the General Assembly authorized DPW to regulate and supervise "[a]ll institutions for adults" in Pennsylvania.  PWC § 902(8).  When the Assembly created the Department of Aging, however, it granted to PDA the "powers and duties [that] specifically concern and are directed to advancing the well-being of Pennsylvania's older citizens."  71 Pa. Cons. Stat. Ann. § 581-1(1).  In doing so, the General Assembly repealed the powers of the DPW, insofar as they were inconsistent with the powers granted to PDA.  P.L. 477, No. 70, Gen. Assem. § 13(b) (Pa. 1978) (The Act creating the Department of Aging repeals "the act of June 13, 1967 (P.L.31, No.21), known as the 'Public Welfare Code,' . . . insofar as it is inconsistent herewith.").

The general powers of PDA are stated in 71 Pa. Cons. Stat. Ann. § 581-3.  Its authority does not include the power to license personal care homes.  *See id.*  Instead, PDA has the responsibility to "[r]eview and comment on all rules, regulations, eligibility or payment standards issued by the Department[ ] of Public Welfare . . . relating to the licensure and regulation of nursing homes . . . or residential care facilities for older adults.  Said rules, regulations and standards shall not take effect until [DPW submits them] to the [Department of Aging] for comment."  *Id.* § 581-3(26).  Thus, DPW's power to license and regulate personal care homes was not repealed by the act of June 20, 1978 that created PDA.

restraining order, *id.* §§ 1055-56, and the facility operator is subject to a fine and imprisonment, *id.* § 1031.

One of the many requirements to obtain or renew a license is compliance with DPW's regulations on employment practices. These regulations incorporate by reference, wholesale, OAPSA's hiring and employee retention policies. 55 Pa. Code § 2600.52. "Hiring, retention and utilization of staff persons shall be in accordance with the Older Adult Protective Services Act . . . and 6 Pa. Code Chapter 15 (relating to protective services for older adults) and other applicable regulations." *Id.* § 2600.52. "Criminal history checks and hiring policies shall be in accordance with the Older Adult Protective Services Act . . . and 6 Pa. Code Chapter 15 (relating to protective services for older adults)." *Id.* § 2600.51.

By incorporating OAPSA into the licensing regulations, DPW also incorporates *Nixon*'s interpretation of OAPSA. When the Supreme Court of Pennsylvania has interpreted certain statutory language, subsequent regulations on the same subject matter must be read with the same interpretation. *See* 1 Pa. Cons. Stat. Ann. § 1922(4) (controlling statutory construction). The DPW employment standards here were adopted almost sixteen months after *Nixon* was handed down. 35 Pa. Bull. 2499 (Apr. 23, 2005). Therefore, the court must read the regulations to incorporate *Nixon*'s interpretation of OAPSA. *Nixon* held that the provision requiring termination of certain individuals with barrier offenses, as it applied to the plaintiffs in that case, violated the Pennsylvania constitution. Thus, the DPW regulations must be read to compel compliance with OAPSA except to the extent that it requires termination of individuals similarly situated to the *Nixon* plaintiffs.

## 2. Analysis

The statutes and regulations governing licenses for personal care homes do not prohibit Ms. Poth's reinstatement. The licensing regulations require compliance with OAPSA's employment policies, as they were modified by *Nixon*. As observed *supra*, Ms. Poth would be prohibited from continued employment by Glenshire Woods if OAPSA was the only text governing her reinstatement. *Nixon*, however, allows Ms. Poth to remain employed because it held the mandatory termination provision unconstitutional as applied to plaintiffs similarly situated to her. Therefore, the provision is constitutionally invalid as it is applied to Ms. Poth. There is no other specific provision of the DPW licensing regulations implicated by the facts presented here.[4]

Because the DPW regulations incorporate OAPSA as it was interpreted in *Nixon*, Ms. Poth's reinstatement is not prohibited by positive law under the statutory and regulatory scheme for licensing personal care homes. The arbitrator's award must stand under the public policy analysis of DPW statutes and regulations.

---

[4]The parties note a provision in the DPW regulations that allow a personal care home to apply for an exception to the licensing requirements, 55 Pa. Code § 2600.19, including the employment policy mandate. Because the court concludes that the DPW hiring regulations do not prohibit Ms. Poth's reinstatement, there is no need to consider whether Ms. Poth could have qualified for a waiver of those regulations.

**IV.**        <u>**Conclusion**</u>

Ms. Poth's reinstatement is not contrary to public policy because it is not prohibited by positive law.  Thus, the award entered by the arbitrator in this matter is affirmed.  The court will deny Glenshire Woods's motion for summary judgment and grant the summary judgment motion of the Union.  An appropriate order will issue.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  October 17, 2006.

23

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**EXTENDICARE HEALTH
SERVICES INC.,**

   **Plaintiff and
   Counterclaim
   Defendant**

  **v.**

**DISTRICT 1199P, SERVICE
EMPLOYEES INTERNATIONAL
UNION, AFL-CIO, CLC,**

   **Defendant and
   Counterclaim
   Plaintiff**

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil No. 1:05-2676

**JUDGE SYLVIA H. RAMBO**

**O R D E R**

   In accordance with the accompanying memorandum of law, **IT
IS HEREBY ORDERED THAT**:

   1) The Motion for Summary Judgment by Plaintiff Extendicare Health
Services, Inc., (Doc. 20) is **DENIED**;

   2) The Motion for Summary Judgment by Defendant District 1199P,
Service Employees International Union, (Doc. 16) is **GRANTED**;

   3) The Clerk of Court is directed to **ENTER JUDGMENT** in favor of
Defendant District 1199P, Service Employees International Union, and against
Plaintiff Extendicare Health Services Inc.; and

4) The Clerk of Court shall close the file.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  October 17, 2006.